IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

GLORIA CONYEARS                                                    PLAINTIFF

v.                              Case No. 2:11-cv-00094-KGB

DR. ARTHUR TUCKER, et al.                                          DEFENDANTS

<u>OPINION AND ORDER</u>

Plaintiff Gloria Conyears brings this action under 42 U.S.C. § 2000e *et seq*. ("Title VII")

and 42 U.S.C. § 1983 against defendants Dr. Arthur Tucker, Superintendent of the Brinkley,

Arkansas, School District; the Brinkley School District (the "District"); and John Carroll, Rick

Hampton, Willie Oxner, Jason Martin, Larry Loewer, and Ken Harvey, individually and in their

official capacities as members of the Board of Directors of the Brinkley School District (the

"Board").   Ms. Conyears alleges gender and race discrimination, disparate treatment, and

retaliation.   Before the Court is defendants' motion for summary judgment (Dkt. No. 36).   Ms.

Conyears has responded (Dkt. No. 46), and defendants have replied (Dkt. No. 56).   For the

reasons that follow, defendants' motion for summary judgment is granted in part and denied in

part.

I.      **Factual Background**

The following facts are undisputed and taken from defendants' statement of undisputed

facts (Dkt. No. 38) and Ms. Conyears's responses to defendants' statement of undisputed facts

(Dkt. No. 45), unless otherwise specified by citation.

During the 2003–2004 school year, Ms. Conyears, was employed by the Brinkley School

District ("the District") as the assistant high school principal with an annual salary of

$49,705.00.  For the 2004–2005 school year, Ms. Conyears applied for and was hired as the middle school principal, with an annual salary of $64,026.49.

At some point, the District adopted a reduction-in-force policy ("RIF") pursuant to Arkansas Code Annotated § 6-17-2407,[1] under which teachers and administrators were assigned a number of points based on such required criteria as number of years of service in the district, education, years of service in the current position, years of service outside the district, and licensure.  Beginning in 2006, the District began taking steps to institute its RIF due to a decline in the number of students enrolled in the District and a corresponding reduction in school funding.  Citing Ms. Conyears's deposition testimony, defendants state that enrollment in the middle school alone decreased by approximately 100 students from approximately 240 students in the 2004–2005 school year to approximately 150–160 students by the 2006–2007 school year (Dkt. No. 38, ¶ 3; *see* Dkt. No. 36-1, at 7).

Defendants claim that, based on the number of high school and middle school students enrolled in the District, the District eliminated one of its three principal positions, with the same principal position serving both the middle school and the high school.  In a January 5, 2007, letter, Dr. Byrd notified Ms. Conyears of his intention to recommend to the Board not to renew Ms. Conyears's contract with the District because the middle school and high school could be served by one principal, serving part-time for each school; she did not have the necessary certification to serve as the high school principal; and she had fewer RIF points than the individual employed as the elementary school principal at the time (Dkt. No. 36-2, at 10).  Dr. Byrd's letter notified Ms. Conyears of her right to request a hearing before the Board.

---

[1]  Arkansas Code Annotated § 6-17-2407(a) provides, "It is the public policy of the State of Arkansas that each school district shall have a written policy on reduction in force based upon objective criteria for a layoff and recall of employees."

According to Ms. Conyears, in February 2007, a group of parents led by her husband, a local minister, organized "to express their concerns regarding the Brinkley School District's purported lack of consideration and adverse treatment and learning environment of African American students and staff," which resulted in a two-week "boycott" in March 2007 in which parents held their children out of school (Dkt. No. 36-1, at 8, 10, 41; Dkt. No. 53, at 2-3). She claims that, prior to the boycott, her husband was a vocal participant of the group in a meeting with Dr. Byrd and voiced the group message that it might become necessary for African-American parents to withdraw their children from school (Dkt. No. 53, at 2-3). She further asserts that Linda Hamilton, principal of the elementary school, later asked Ms. Conyears whether she shared the group's concerns and intentions, to which Ms. Conyears claims she responded yes (Dkt. No. 53, at 3).

The Board held a hearing on March 15, 2007, regarding Dr. Byrd's recommendation not to renew Ms. Conyers's contract. At the hearing, Dr. Byrd acknowledged that some type of supervisor would be needed at the middle school after eliminating Ms. Conyears's position as middle school principal, which he said would probably be a dean of students position that he likely would fill by reassigning duties among existing employees, not by hiring for a new position (Dkt. No. 46-18, at 5-9). At the hearing, the Board voted to accept as true Dr. Byrd's reasons for the recommended nonrenewal of Ms. Conyears's contract but voted to modify the recommendation and to "[a]ssign Ms. Conyears as Dean of Students with her pay being at the appropriate level on the teacher salary schedule according to her education and experience, with the provision that Dr. Byrd may recommend to the Board that she be assigned to other duties, such as classroom teacher" (Dkt. No. 36-3, at 3-4). Ms. Conyears claims that the elimination of

her position as middle school principal was in retaliation for her support of her husband's complaints to the District.

By letter dated March 16, 2007, Dr. Byrd wrote to Ms. Conyears to offer her a new contract to serve "as Dean of Students of the Middle School beginning in the 2007–2008 school year" explaining that her salary would "be that of a classroom teacher at [her] level of education and experience" (Dkt. No. 36-1, at 34).  Ms. Conyears entered into a contract for the 2007–2008 school year to perform services as "Dean of Students, with other duties as assigned by [the] Superintendent," for an annual salary of $47,625.00 (Dkt. No. 45, ¶ 7; Dkt. No. 36-1, at 35).  On September 10, 2007, the Board adopted Dr. Byrd's recommendation that Ms. Conyears serve half time as dean of students and half time as elementary social studies teacher.

Following the 2007–2008 school year, after determining that the high school principal could handle the responsibilities assigned to the dean of students, the Board eliminated the position and reassigned Ms. Conyears as a full-time sixth grade teacher with an annual salary of $47,825.00 (Dkt. No. 45, ¶ 8; *see* Dkt. No. 36-2, and 36-1, at 31-32).

The District later determined that the position of dean of students was necessary to assist the high school principal with his duties, and beginning in the 2008-2009 school year, the District advertised for the "Dean of Secondary Students" position to serve grades 7–12. Defendants assert that, after receiving an application from Ms. Conyears for the dean of secondary students position and knowing that her certification was kindergarten through ninth grades, Bethany McGruder, Dr. Byrd's successor as Superintendent, contacted the Arkansas Department of Education ("ADE") to determine whether an applicant certified in  kindergarten through ninth grades was qualified for the position.   According to defendants and Ms. McGruder's affidavit, the ADE responded that "[i]f the Dean of Students will be serving grades

7–12, that would be the appropriate grade level for the individual to be licensed in" (Dkt. No. 36-5, at 2). Ms. McGruder's affidavit includes as an attachment a March 9, 2009, email from Ron Tolson with the ADE stating that the dean of students "must be licensed at the grade level at which they are serving as dean of students" (*Id*. at 3). Defendants state that Ms. McGruder informed Ms. Conyears by letter of the information that she received from the ADE. Ms. Conyears denies these allegations, without elaboration, citing an email and letter of December 20, 2013, from Karli Saracini at the ADE, which stated that, under the ADE's job code management system, the dean of students position may be filled by an individual with one of two licensure codes, licensure code 184 for grade levels 7–12 or licensure code 402 for grade levels K–12 (Dkt. No. 45, ¶ 11; Dkt. No. 46-12).[2]

On June 23, 2009, Ms. Conyears resigned her position as sixth grade teacher with the District, stating in her resignation letter, "[I]t is now time to do other things that I aspire to do" (Dkt. No. 45, ¶ 12; Dkt. No. 36-1, at 39). Ms. Conyears's husband was elected to the Board for a term beginning September 2009.

When Ms. McGruder did not seek a contract renewal following the term ending June 30, 2010, the Board hired Dr. James Best as Superintendent. Ms. Conyears admits that Dr. Best did not commit any acts of discrimination against her (Dkt. No. 45, ¶ 14). Dr. Best resigned on May 11, 2011. The Board then hired Dr. Arthur Tucker, an African-American male, as the Superintendent for a term beginning July 1, 2011 (Dkt. No. 45, ¶ 14).

The high school principal position became open for the 2011–2012 school year. Ms. Conyears had already submitted an application for the position as high school principal for the

_____

[2] Ms. Conyears's license for January 1, 2009, though December 31, 2013, shows that she has license code 184 for grade levels 1–6 and license code 402 for grade levels K–9 (Dkt. No. 46-12, at 2).

2011–2012 school year when Dr. Tucker began working as Superintendent on July 1, 2011.  Ms. Conyears was not chosen to be interviewed for the position of high school principal.  Dr. Tucker testified that she was not selected because she is not certified for the position.  Ms. Conyears's ADE Teacher's License for January 1, 2009, to December 31, 2013, shows her licensure as an elementary principal, grades K–09, and as elementary teacher, grades 1–6 (Dkt. No. 38, ¶ 17; Dkt. No. 36-4 at 24).  On July 14, 2011, the District interviewed Darren Busch, an African-American male with an initial three-year certification as a building-level administrator for grades 5–12, valid from June 16, 2011, through June 16, 2014 (Dkt. No. 38, ¶ 19; Dkt. No. 36-3, at 7).  Mr. Busch was ultimately selected for the position of high school principal.

Ms. Conyears disputes that she was not certified for the position of high school principal and claims that she "was certifiable just as selectee Busch" (Dkt. No. 45, ¶ 17).  She further claims that Mr. Busch was not qualified or certified for the position when he interviewed because he did not receive his standard five-year license as an administrator until May 15, 2012 (Dkt. No. 45, ¶¶ 18, 20).  Citing the affidavit of Darrick Williams, Licensure Specialist with the ADE, defendants assert that an individual with an initial three-year certification, such as Mr. Busch, is certified but must complete a one-year mentoring program to obtain a standard five-year license (Dkt. No. 38, ¶20; Dkt. No. 36-6).  Dr. Tucker testified that he served as Mr. Busch's mentor pursuant to an approved mentoring plan.

Dr. Tucker also stated that Ms. Conyears was not interviewed for the high school principal position in 2011 because of the conflict with hiring her while her husband served on the Board, per the ADE's ethical rule against hiring board member's family members.  That rule tracks Arkansas Code Annotated § 6-24-105, which provides in part that a board member's family member "may not be initially employed by the public educational entity the member

serves during the member's tenure of service on the local board for compensation" unless the Commissioner of Education "issues a letter of exemption and approves the employment contract based on unusual and limited circumstances." *Id*. (b)(1)(A)(i).  According to defendants and Dr. Tucker in his deposition, Dr. Tucker believes that the Board members' spouses who are employed by the District now began their employment before their spouses were elected to the Board (Dkt. No. 38, ¶ 15; Dkt. No. 36-4, at 20-21).  Ms. Conyears denies this, claiming that Dr. Tucker is speculating and that defendants cite no authority for Dr. Tucker's belief (Dkt. No. 45, ¶ 15).  In her briefing, Ms. Conyears contends that the wives of Board members Mr. Carroll and Mr. Oxner were initially hired while Mr. Carroll and Mr. Oxner were on the Board, although the record evidence she cites does not support this assertion (Dkt. No. 53, at 6 ¶ 24).  Defendants in their reply present authenticated copies of Ms. Oxner's and Ms. Carroll's employee cards and the oaths taken by Mr. Oxner and Mr. Carroll as Board members, showing that Ms. Oxner was most recently hired in August 1995, while Mr. Oxner took his oath as a Board member on October 2006, and that Ms. Carroll was most recently hired in August 1998, while Mr. Carroll took his oath in September 2002 (Dkt. No. 56-2, at 3-4).

Lastly, although not addressed in any detail in the parties' statements of fact, Ms. Conyears alleges that she applied for the high school principal position on July 1, 2012, after it became vacant again.  She alleges that she was denied an interview and that the position was filled with an African-American male candidate, Samuel White, who she claims she is more qualified than (Dkt. No. 33, ¶ 22).  On September 12, 2012, Ms. Conyears filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging gender discrimination and retaliation regarding the Board's decision not to hire her for the 2012 high

school principal position (Dkt. No. 33-1).  The EEOC issued a dismissal and notice of rights to sue on March 29, 2013 (Dkt. No. 33-2).

## II.       Summary Judgment Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (internal citations and quotations omitted).  "Because summary judgment is not disfavored and is designed for 'every action,' panel statements to the contrary are unauthorized

and should not be followed." *Id.*  Accordingly, this Court applies the same summary judgment standard to discrimination cases as it does to all other cases.

### III.    Overview Of Claims

Ms. Conyears asserts several discrimination and retaliation claims.  In her briefing and in her pretrial disclosure sheets, she clarifies that she is pursuing the following claims:  (1) race discrimination and retaliation for the elimination of her position as middle school principal in 2007; (2) race discrimination for the elimination of her position as dean of students in 2008; (3) race discrimination for the denied promotion to the dean of secondary students position in 2009; and (4) gender discrimination and retaliation for the failure to hire her as high school principal in 2011 and 2012  (Dkt. No. 53, at 11-22 Dkt. No. 64, ¶ 3).   Ms. Conyears brings each claim under § 1983, except the failure-to-hire claim for the 2012 high school principal position, which, according to her second amended complaint, she brings under § 1983 and Title VII.

Based on Ms. Conyears's briefing and pretrial disclosures, the Court determines that, to the extent her second amended complaint can be construed to allege the following claims, Ms. Conyears has abandoned these claims based on her briefing and pretrial disclosures.   Ms. Conyears has abandoned any claim that she "was demoted from Vice Principal of the High School to principal of the Middle School" (Dkt. No. 33, ¶ 7).  She does not list this as a claim she is pursuing when identifying such claims in her briefing or pretrial disclosures, agrees that she applied for the position of middle school principal and received a substantial salary increase, and even refers to this job change as a promotion in her briefing (Dkt. No. 64; Dkt. No. 45, ¶ 1; Dkt. No. 53, at 12).

The Court further determines that Ms. Conyears has abandoned any failure-to-promote claim based on the federal coordinator position (Dkt. No. 33, ¶¶ 7-8).  Defendants specifically

addressed this claim in their request for summary judgment, Ms. Conyears failed to respond, and she does not mention this as a claim she is pursuing when identifying such claims in her briefing or pretrial disclosures (Dkt. No. 37, at 13-14; Dkt. No. 53; Dkt. No. 64).  In addition, the Court determines that Ms. Conyears has abandoned any claim that she was forced to resign based on any allegation of demotion or denied promotion (Dkt. No. 33, ¶¶ 7, 16).  Defendants specifically addressed this claim for constructive discharge in their request for summary judgment, but Ms. Conyears failed to respond.  She does not mention this claim in her briefing or list it as a claim she intends to pursue in her pretrial disclosures (Dkt. No. 37, at 9, 13; Dkt. No. 53; Dkt. No. 64). The Court will examine Ms. Conyears's remaining claims.

## IV.    Discrimination Claims

Ms. Conyears alleges disparate treatment on the basis of her race and gender in violation of the Equal Protection Clause of the Fourteenth Amendment, through 42 U.S.C. § 1983. Section 1983 discrimination claims are analyzed under the same framework as Title VII discrimination claims.  *See Richmond v. Bd. of Regents of Univ. of Minn.*, 957 F.2d 595, 598 (8th Cir. 1992) (applying the same analysis to discrimination claims under Title VII, § 1981, § 1983; and the Age Discrimination in Employment Act); *Briggs v. Anderson,* 796 F.2d 1009, 1021 (8th Cir. 1986) (confining discussion of plaintiff's claims to Title VII after finding that "[t]he inquiry into intentional discrimination is essentially the same for individual actions brought under §§ 1981 and 1983"); *Craik v. Minn.State Univ. Bd.,* 731 F.2d 465, 468 n. 5 (8th Cir. 1984) ("The issue of discriminatory intent is common to analyses under the Fourteenth Amendment, § 1983, and Title VII.").

To establish her claim, Ms. Conyears can either provide direct evidence of discrimination or create an inference of unlawful discrimination under the three-step analysis set out in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir. 2012).  Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action.  *Torgerson*, 643 F.3d at 1044 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)).  The Court sees no direct evidence of discrimination on the record before it.  Further, Ms. Conyears identifies no direct evidence of unlawful discrimination and instead argues her case under *McDonnell Douglas*.  For these reasons, the Court will proceed with a *McDonnell Douglas* analysis.

Under the *McDonnell Douglas* analysis, "the plaintiff bears the burden of establishing a *prima facie* case of discrimination."  *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007).  To make a *prima facie* case, Ms. Conyears must show that:  (1) she was a member of the protected group; (2) she was qualified to perform the job; (3) she suffered an adverse employment action; and (4) circumstances permit an inference of discrimination.  *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1038 (8th Cir. 2010).  "The required prima facie showing is a 'flexible evidentiary standard,'" and Ms. Conyears can satisfy the fourth part of the *prima facie* case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker.  *Id.* at 1039-40 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)); *see Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011).

If Ms. Conyears makes out a *prima facie* case, she "creates a presumption of unlawful discrimination, rebuttable through the showing of a legitimate nondiscriminatory reason for the action."  *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 990 (8th Cir. 2011); *see Burton v.*

*Arkansas Sec'y of State*, 737 F.3d 1219, 1229 (8th Cir. 2013).  Defendants' burden to show a legitimate, nondiscriminatory reason for the challenged action "is not onerous."  *Bone*, 686 F.3d at 954.  Once defendants provide a non-discriminatory, legitimate reason, "the presumption of discrimination disappears, requiring [Ms. Conyears] to prove that the proffered justification is merely a pretext for discrimination."  *Twiggs v. Selig*, 679 F.3d 990, 993 (8th Cir. 2012) *cert. denied*, 133 S. Ct. 1252 (2013).  Ms. Conyears, as the plaintiff, has the burden of persuasion at all times.  *Bone*, 686 F.3d at 955.  Ms. Conyears's burden to show a genuine issue of material fact regarding pretext "merges with the ultimate burden of persuading the court that [she was] the victim of intentional discrimination."  *Id.* (internal quotation mark and citation omitted).

There are additional considerations when the demotion or discharge occurs pursuant to a RIF.  Ordinarily, terminating a competent employee or replacing one with an individual outside of the protected class is sufficient to satisfy the fourth element of a plaintiff's *prima facie* case in a discharge or demotion context.  However, the Eighth Circuit has said that "some additional showing should be necessary to make a *prima facie* case in a reduction-in-force situation."  *Holley v. Sanyo Mfg., Inc.*, 771 F.2d 1161, 1165-66 (8th Cir. 1985) (examining a RIF claim in the context of the ADEA); *Herrero v. St. Louis Univ. Hosp.*, 109 F.3d 481, 483-84 (8th Cir. 1997) (examining a RIF claim in the context of Title VII).  However, the Eighth Circuit has said that "the 'additional showing' inquiry is not a significant hurdle for an employment discrimination plaintiff."  *Yates v. Rexton, Inc.*, 267 F.3d 793, 799 (8th Cir. 2001) (citing *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 778-79 (8th Cir. 1995) ("The only question is whether the circumstances are such that, in the absence of an explanation from the defendant, a fact finder may reasonably infer intentional discrimination.")).  "A plaintiff may meet the last requirement by presenting either statistical evidence (such as a pattern of forced early retirement

or failure to promote older employees) or 'circumstantial' evidence (such as comments and practices that suggest a preference for younger employees)." *Hanebrink v. Brown Shoe Co.*, 110 F.3d 644, 646 (8th Cir. 1997) (ADEA context) (quoting *Holley*, 771 F.2d at 1166).  The RIF also impacts the third stage of the *McDonnell Douglas* analysis in that the Eighth Circuit has made it clear that a RIF "certainly constitutes" a legitimate, nondiscriminatory reason.  *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 702 (8th Cir.2006); *see also Regel v. K-Mart Corp.*, 190 F.3d 876, 879 (8th Cir. 1999) ("A company's exercise of its business judgment [to implement an RIF] 'is not a proper subject for judicial oversight.'") (quoting *Bashara v. Black Hills Corp.*, 26 F.3d 820, 825 (8th Cir. 1994)).

### A.      Race Discrimination Claims

Ms. Conyears asserts several claims of race discrimination based on the events about which she complains.  The Court will examine each in turn.

### 1.      2007 Elimination Of The Middle School Principal Position

Ms. Conyears claims that the Board's decision in March 2007 to eliminate the middle school principal position and not to renew her contract as middle school principal was racially motivated.  Defendants argue first that Ms. Conyears has failed to establish a *prima facie* case of race discrimination because she has not shown that similarly situated employees not in the protected class were treated more favorably.  Specifically, they maintain that Ms. Conyears had fewer RIF points than the elementary school principal and that Ms. Conyears was not certified to be employed as the high school principal.  Defendants further argue that, even if Ms. Conyears has established a *prima facie* case of alleged race discrimination, the RIF policy is a legitimate, nondiscriminatory reason for the Board's challenged 2007 decision regarding the middle school principal position.  In support of her *prima facie* case and her claim of pretext, Ms. Conyears

alleges that Dr. Byrd's recommended RIF affected her and African-American employees negatively and that two Board members contended that the decision appeared to be motivate by race.  She further argues that the RIF is a pretext for discrimination because Dr. Byrd and the Board admitted that a supervisor would be needed to replace the middle school principal position.

Assuming without deciding that Ms. Conyears has established a *prima facie* case of race discrimination as to the Board's challenged 2007 decision regarding the middle school principal position, the Court finds that this claim fails at the pretext stage.  The Court finds that defendants have articulated a legitimate, nondiscriminatory reason for not renewing Ms. Conyears's contract as middle school principal—the RIF.  *Wells*, 469 F.3d at 702.  Therefore, the burden shifts to Ms. Conyears to show that the proffered reason is merely pretext.

To prove pretext, Ms. Conyears must both discredit the employer's asserted reason and show that the circumstances permit drawing the reasonable inference that the real reason was race.  *Johnson v. AT & T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005).  "There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext."  *Torgerson*, 643 F.3d at 1047.  First, "[a] plaintiff may show that the employer's explanation is unworthy of credence . . . because it has no basis in fact.  Alternatively, a plaintiff may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer."  *Id.* (alterations in original) (citations omitted) (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006)) (internal quotation marks omitted).  "A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).

Ms. Conyears seeks to rebut defendants' proffered explanation by challenging the legitimacy of the RIF, claiming that "[t]he RIF was not a business decision, but was a pretext for racial discrimination" (Dkt. No. 53, at 12). Specifically, she seeks to rebut the proffered cost-savings justification by suggesting that: (1) the middle school had been established just three years prior to March 2007 to assist students in receiving an education and (2) Dr. Byrd, while proposing to eliminate as unnecessary Ms. Conyears's position as middle school principal, admitted at the March 27, 2007, hearing that he would need a supervisor for the middle school, which ultimately was the dean of students position. These arguments do not show pretext. First, while the middle school had been created only three years prior, Ms. Conyears herself testified that the enrollment at the middle school decreased from approximately 240 students in 2004 to approximately 150–160 students by the 2006–2007 school year, and the middle school was ultimately eliminated (Dkt. No. 36-1, at 7). Likewise, Dr. Byrd's acknowledgement that the District would need a supervisor at the middle school after eliminating Ms. Conyears's position as middle school principal does not suggest pretext, as Dr. Byrd made clear that he would find a supervisor for the middle school through reassigning duties among existing employees, not hiring for a new position, and that his plan would not add to costs (Dkt. No. 46-18, at 5-9). Although the Board modified Dr. Byrd's recommendation and opted to create a dean of students position for Ms. Conyears, that position was created with the caveat that Ms. Conyears could be reassigned to teaching duties, if a position came available, and that she receive a teacher's salary. Ms. Conyears has not demonstrated a genuine issue of material fact that the District's implementation of the RIF is a mere pretext. The Court notes that the Eighth Circuit has stressed that "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments

made by employers, except to the extent that those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995).

Ms. Conyears also asserts that Dr. Byrd's recommended RIF affected African-American employees Eisdadore Branch[3] and Dr. Linda English negatively.  Specifically, Ms. Conyears asserts that Dr. Byrd replaced Mr. Branch, a counselor, with a Caucasian female, Angie Shaffer, who Ms. Conyears claims was not certified as a counselor.  To the extent Ms. Conyears attempts to show pretext through comparator evidence, her argument fails.  Mr. Branch and Dr. English are not appropriate comparators, as they are members of the same protected class, and Ms. Shaffer is not similarly situated to Ms. Conyears.  "At the pretext stage, 'the test for determining whether employees are similarly situated to a plaintiff is a rigorous one.'"  *Bone*, 686 F.3d at 956 (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005), *abrogated on other grounds by Torgerson*, 643 F.3d 1031).  To succeed at the pretext stage, Ms. Conyears must show that she and the potential comparators she identifies were "similarly situated in all relevant respects."  *Id.* (quoting *Rodgers*, 417 F.3d at 853).  The employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."  *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011) (quoting *Cherry v. Ritenour Sch. Dist.,* 361 F.3d 474, 479 (8th Cir. 2004)).  Ms. Shaffer is not similarly situated to Ms. Conyears.  In so far as Ms. Conyears relies upon Ms. Shaffer to show that certification is not necessary, Ms. Shaffer did not apply for the same position as Ms. Conyears.  Moreover, Dr. Byrd testified that Ms. Shaffer was hired as a counselor because the District had no certified applicants for the position (Dkt. No. 36-1, at 14-15).  In contrast, Ms. McGruder testified that she had fully-certified applicants for the

---

[3] Ms. Conyears's brief uses both "Isadore" and "Eisadore" Branch.

dean of students position Ms. Conyears sought (Dkt. No. 46-2, at 6-7).   Ms. Shaffer is not an appropriate comparator.

To the extent Ms. Conyears attempts to argue disparate impact under the RIF by relying upon her evidence regarding Mr. Branch and Dr. English, such a claim is not viable under § 1983.  *Foster v. Wyrick*, 823 F.2d 218, 222 (8th Cir. 1987) ("We thus conclude that a Title VII disparate impact claim may not be asserted in a § 1983 action.").   Her generic arguments of disparate impact do not show pretext.  *See Bogren v. Minnesota,* 236 F.3d 399, 406 (8th Cir. 2000) (disregarding plaintiff's allegation that she was the only African-American female trooper ever employed by the specific patrol because "the generic type of employment statistics presented by [plaintiff] are not probative of the reason for her termination").   Moreover, the record contradicts any allegation of disparate impact; according to Dr. Byrd's affidavit and attachments, the racial make-up of individuals whose positions were eliminated by the RIF is 38% percent African-American and 61% Caucasian (Dkt. No. 36-2, at 9).

Ms. Conyears further asserts that the African-American Board members Ken Harvey and Lori Wofford contended at the hearing that the decision appeared to be motivated by race (Dkt. No. 53, at 12).   This is unpersuasive.   First, it is not clear how Ms. Conyears believes these statements, if made, show pretext.   Moreover, the hearing transcript submitted by Ms. Conyears does not support her assertions.   Mr. Harvey suggested he objected to the RIF and that the District needed to keep Ms. Conyears to have an African-American leader for a predominantly African-American student population (Dkt. No. 46-18, at 10-12, 19-20).   Ms. Wofford made no comments regarding race in the excerpted transcript Ms. Conyears submitted to the Court for review as part of the record.

The Court finds that Ms. Conyears has failed to establish a genuine issue of material fact that defendants discriminated against her on the basis of her race in implementing the RIF and not renewing her contract in 2007 as middle school principal.   Accordingly, the Court grants defendants' motion for summary judgment as to Ms. Conyears's race discrimination claim based on the 2007 elimination of the middle school principal position.

### 2.      2008 Elimination Of The Dean Of Students Position

Ms. Conyears purports to allege a separate claim of race discrimination based on the Board's May 1, 2008, decision to reassign her as a sixth-grade teacher.   According to Dr. Byrd, the Board determined following the 2007–2008 school year that the high school principal could handle the responsibilities assigned to the dean of students and, therefore, eliminated the dean of students position (Dkt. No. 36-2, ¶ 6).   In their moving papers, defendants do not address this claim separately from the Board's March 2007 decision.   Ms. Conyears has not established an adverse employment action to support a claim based on the 2008 elimination of the dean of students position.

In 2007, the Board created the dean of students position and offered it to Ms. Conyears with the condition that her pay for the position be that of a classroom teacher at her level of education and experience and that it could be eliminated by reassigning Ms. Conyears to teaching duties.   Ms. Conyears entered into a contract for the 2007–2008 school year to perform services as "Dean of Students, with other duties as assigned by [the] Superintendent," for an annual salary of $47,625.00 (Dkt. No. 45, ¶ 7; Dkt. No. 36-1, at 35).   On September 10, 2007, the Board adopted Dr. Byrd's recommendation that Ms. Conyears serve half time as dean of students and half time as elementary social studies teacher.   Following the 2007–2008 school year, the Board eliminated the dean of students position and reassigned Ms. Conyears as a full-

time sixth grade teacher with an annual salary of $47,825.00 (Dkt. No. 45, ¶ 8; *see* Dkt. No. 36-2, and 36-1, at 31-32).

Under these circumstances, Ms. Conyears has not demonstrated that, as a result of Board action in 2008, she suffered actual diminution in title or a reassignment of duties from the position she accepted in 2007 that resulted in a significant change of working conditions. "Changes in duties or working conditions that cause no materially significant disadvantage are insufficient to establish the adverse conduct required to make a *prima facie* case." *Harlston v. McDonnell Douglas Corp*., 37 F.3d 379, 382 (8th Cir. 1994). In *Harlston*, the court determined that a secretary's reassignment to a different position without any reduction in title, salary, or benefits, even though the new position involved fewer secretarial duties and was more stressful, did not constitute an adverse employment action. The *Harlston* court characterized the move as "nothing 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id*. (quoting *Crady v. Liberty Nat'l Bank & Trust Co*., 993 F.2d 132, 136 (7th Cir. 1993)). Accordingly, Ms. Conyears has not established a *prima facie* case based on the 2008 elimination of the dean of students position.

Even if she could establish a *prima facie* case based on the 2008 elimination of the dean of students position, her race discrimination claim would fail at the pretext stage for the same reasons her claim based on the Board's 2007 decision fails. Defendants' motion for summary judgment as to the 2008 elimination of the dean of students position is granted.

### 3.     2008 Decision Regarding Federal Programs Coordinator

Ms. Conyears alleges in her second amended complaint that she was discriminated against in being passed over for a promotion for the federal programs coordinator position in 2009 (Dkt. No. 33, ¶ 7). The Court determines that Ms. Conyears has abandoned any failure-to-

promote claim based on the federal coordinator position.  She alleges that the Board chose Judy Hubble over her for the federal coordinator position without defendants having utilizing a formalized process of posting the vacancy and without Ms. Hubble applying for the position (*Id.*, ¶ 7, 9).  To establish a *prima facie* case of race discrimination for a failure-to-promote claim, a plaintiff must show that:  (1) she is a member of a protected group; (2) she was at least "minimally qualified" and applied for a promotion to an available position; (3) she was rejected; and (4) similarly situated employees, not part of the protected group, were promoted instead. *Bennett v. Nucor Corp.*, 656 F.3d 802, 820 (8th Cir. 2011); *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1086 (8th Cir. 2011).

Defendants move for summary judgment on this claim, challenging the veracity of Ms. Conyears's version of events and the assertion that the position can serve as the basis for a failure-to-promote claim.  Ms. Conyears testified in her deposition that she applied by approaching Ms. McGruder shortly after Ms. McGruder succeeded Dr. Byrd as Superintendent in July 2008 to request consideration for the federal programs coordinator position.  She claims Ms. McGruder refused to consider her for the position.  Defendants contend this could not have happened, as Dr. Byrd and Ms. McGruder state in their affidavits that Dr. Byrd assigned Ms. Hubble the federal program coordinator duties before Ms. McGruder was on the scene (Dkt. No. 36-2, ¶ 7; Dkt. No. 36-5, ¶ 2).

Beyond this factual challenge, defendants argue that the alleged denial of the federal programs coordinator position cannot support a failure-to-promote claim because this was not actually a job position or promotion but simply a re-assignment of duties.  According to Dr. Byrd's affidavit, Ms. Hubble was assigned the federal program coordinator duties with no additional compensation (Dkt. No. 36-2, ¶ 7).  Dr. Tucker also testified that Ms. Hubble does not

get paid any extra money for performing federal program coordinator duties (Dkt. No. 36-4, at 8–9).  Indeed, the record indicates that, for the 2008–2009 school year, Ms. Hubble held a position as elementary school teacher with "extra duties" that included "federal programs" (Dkt. No. 36-3, at 6).  Further, Ms. Hubble's salary was slightly less than Ms. Conyears's salary for that period (*Id*.).  Consequently, defendants contend there was no actual denial of a promotion and that this cannot be an adverse employment decision.

Ms. Conyears does not address this claim in her response except for briefly mentioning the position in her statement of facts.  She does not address defendants' arguments or otherwise discuss this claim.  Accordingly, the Court finds that Ms. Conyears has abandoned her claim regarding the federal coordinator position.  Defendants' motion for summary judgment as to the federal coordinator position is granted.

### 4.        2009 Decision Regarding Dean Of Secondary Students

Ms. Conyears in her briefing asserts a claim for race discrimination based on the denial of the dean of secondary students position in January 2009, which was filled by Chester Lucas, presumably a Caucasian male (Dkt. No. 46-9).  Ms. Conyears does not specifically assert this claim in her second amended complaint, although defendants address it in their statement of facts and in their reply.  Even if Ms. Conyears had asserted this claim in her second amended complaint, summary judgment is appropriate.

Assuming without deciding that Ms. Conyears was minimally qualified and could establish a *prima facie* case of race discrimination regarding the dean of secondary students position open in 2009, defendants have established a legitimate, nondiscriminatory justification for not selecting her for the position based on the ADE's representations to Ms. McGruder that an applicant for the position needed to be certified through 12th grade.  Ms. Conyears has not

met her burden of showing pretext.  To the extent she attempts to challenge the factual basis of this justification with emails from the ADE regarding job code management systems, it is undisputed that the ADE represented to Ms. McGruder at the time the District considered candidates that the applicant needed to be certified through 12th grade and that Ms. McGruder shared this information at the time with Ms. Conyears.  Moreover, to the extent Ms. Conyears attempts to rely upon evidence regarding qualifications to support a finding of pretext, she must show that the District hired a *less* qualified applicant.  *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 793 (8th Cir. 2011).  "The mere fact that a plaintiff "may have been capable of filling the role of [the position], or that [she] has specific strengths as a candidate, does not show pretext."  *Id*.  She has not made this showing in regard to Mr. Lucas.

Ms. Conyears has failed to show that defendants' proffered reason is a pretext for race discrimination.  She has failed to raise a disputed material issue of fact that defendants discriminated against her in denying her promotion to the dean of secondary students position in 2009.

### 5.        Constructive Discharge

Ms. Conyears in her complaint appears to allege a claim for constructive discharge based on her claims regarding the federal coordinator position.  Defendants move for summary judgment on this claim, arguing that Ms. Conyears has not shown the requisite conditions needed to support a claim for constructive discharge.  Ms. Conyears does not address this in response and apparently abandons any constructive discharge claim.  Regardless, the Court agrees with defendants that Ms. Conyears's has not demonstrated a disputed genuine issue of material fact as to a claim for constructive discharge.

"To prove a constructive discharge, an employee must show that the employer deliberately created intolerable working conditions with the intention of forcing her to quit." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 418 (8th Cir. 2010).  A constructive discharge arises only when a reasonable person would find the conditions of employment intolerable.  *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996).  "Dissatisfaction with a work assignment is, as a matter of law, normally not so intolerable as to be a basis for constructive discharge."  *Id.* at 496 (citing *Carter v. Ball,* 33 F.3d 450, 459 (4th Cir. 1994) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.")).  Likewise, "frustration and embarrassment at not being promoted do not make work conditions sufficiently intolerable to constitute constructive discharge."  *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir. 1995); *see also Tidwell*, 93 F.3d at 495 (suggesting that "a negative and degrading atmosphere sufficient to create constitute constructive discharge" may be present "where a better qualified employee is repeatedly turned down for promotions in favor of inferior candidates," but holding that losing "a single promotion opportunity to an arguably better qualified candidate" does not create "the overwhelming compulsion to quit that is necessary for constructive discharge . . . .").  *Maney v. Brinkley Mun. Waterworks & Sewer Dep't,* 802 F.2d 1073, 1075-76 (8th Cir.1986) (determining that African-American plaintiffs who were passed over for a promotion in favor of a less qualified Caucasian employee were victims of discrimination but were not constructively discharged).

Ms. Conyears's claims, taken together with the record evidence, do not support an objective finding of intolerable conditions sufficient to establish constructive discharge.  Even if she had presented sufficient evidence to establish a *prima facie* case, a claim of constructive

discharge on a disparate impact theory is analyzed under the *McDonnell Douglas* framework. *Hanenburg v. Principal Mut. Life Ins. Co.*, 118 F.3d 570, 574 (8th Cir. 1997).  The Court has determined that Ms. Conyears has failed to show that defendants' nondiscriminatory reasons for their actions underlying this claim were pretextual.  Accordingly, the Court grants defendants' motion for summary judgment as to Ms. Conyears's claim for constructive discharge.

### B.     Gender Discrimination Claims

Ms. Conyears alleges defendants discriminated against her on the basis of her gender in denying her the high school principal position in in 2011 and 2012.  A plaintiff establishes a *prima facie* case for a "failure to hire" claim when she proves that:  (1) she is a member of a protected class; (2) she was qualified for the position for which the employer was accepting applications; (3) she was denied the position; and (4) the employer hired someone from outside the protected class.  *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006).

First, as to the 2011 claim, the parties dispute whether Ms. Conyears has met the second element of the *prima facie* case based on their disagreement as to whether Ms. Conyears was qualified.  Defendants contend she was not qualified for the high school principal position because she was only certified through the ninth grade (Dkt. No. 37, at 14-15).  Ms. Conyears maintains that she was certified, arguing she could have been hired and placed on an Administrator Licensure Completion Plan ("ALCP").  Defendants also contend that Ms. Conyears was not qualified because her husband was on the Board at the time.  Ms. Conyears argues that this should not be considered a qualification for the position.

Even if Ms. Conyears could establish a *prima facie* case, the Court finds that Ms. Conyears has failed to establish a disputed genuine issue of material fact for trial in regard to her failure-to-hire claim for the 2011 high school principal position.  The Court finds that defendants

have met their burden of articulating a legitimate, nondiscriminatory reason for denying Ms. Conyears the high school principal position in 2011 with Dr. Tucker's testimony that Ms. Conyears was not interviewed or hired for the position because is not certified to be a principal, whereas Mr. Busch, like the other applicants selected to be interviewed, was certified, and because Ms. Conyear's husband was a Board member, so hiring her would have been a conflict under the ADE's ethical rules.   The burden shifts to Ms. Conyears to prove that defendants' justification is merely a pretext for discrimination.   *Bone*, 686 F.3d at 955.

Ms. Conyears first attempts to show pretext by repeating her assertion that she was qualified for the position.  She does not dispute that she was not licensed as an administrator through the 12th grade at the time she applied for the position but contends that she nonetheless could have received an ALCP.   Further, she disputes that Mr. Busch was qualified for the position because he did not have a standard administrative license as high school principal at the time.   She also contends that she was more qualified than Mr. Busch, citing Dr. Tucker's testimony that Ms. Conyears was the better-qualified candidate "on paper," as Mr. Busch lacked administrative experience.  Defendants reply that Ms. Conyears's contention that Mr. Busch was not certified is contrary to the facts and the record.   Defendants further contend that her suggestion that the District should have rejected an applicant with the required certification to hire her pursuant to an ALCP is contrary to the ADE's regulations that schools "shall aggressively seek to employ in licensed positions individuals who are licensed and highly qualified (when required) for the grade level and licensure content areas assigned" and should recruit a licensed individual who will work under an ALP or ALCP when the school "cannot employ a qualified individual licensed at the grade level or for the licensure content area being

assigned." *See* ADE Rules Governing Educator Licensure, Rules 9.01.1, 9.01.2; Ark. Admin. Code. 005.16.18-9.0.

The Court finds that Ms. Conyears has failed to establish pretext.  In relying on qualification comparisons, Ms. Conyears must show that the District hired a *less* qualified candidate.  *Barber*, 656 F.3d at 793.  Her claim that Mr. Busch was not licensed is unpersuasive. She does not dispute that Mr. Busch had an initial three-year building-level administrator certification for grades 5–12 (Dkt. No. 36-3, at 7).  She cites no support for finding that Mr. Busch's license was invalid simply because it was an initial three-year license, versus a standard five-year license.  Ms. Conyears's reliance on Dr. Tucker's comment that Ms. Conyears was more qualified "on paper" is likewise unpersuasive.  Dr. Tucker was clear that, despite her experience, Ms. Conyears and other uncertified applicants were rejected for being uncertified. Even if as Ms. Conyears asserts her experience made up for her lack of certification  as compared to Mr. Busch, "[t]he mere existence of comparable qualifications between two applicants . . . alone does not raise an inference of racial discrimination." *Pierce v. Marsh*, 859 F.2d 601, 604 (8th Cir. 1988).

Ms. Conyears further seeks to show pretext based on defendants' proffered reason for not interviewing her that her husband served on the Board and thus that she could not be hired under the ADE's ethical rules for employment of board member's family members.  The statute provides that a Board member's family member may not be initially employed "unless the Commissioner of Education issues a letter of exemption and approves the employment contract *based on unusual and limited circumstances*."  Ark. Code Ann. § 6-24-105(b)(1)(A)(i) (emphasis added).  Further, "[t]he determination of unusual and limited circumstances shall be at the sole discretion of the commissioner and may be further defined by rule of the State Board of

Education." *Id.* § 6-24-105(b)(1)(A)(ii).  Ms. Conyears makes no attempt to show any unusual and limited circumstances that would have justified an exemption in hiring for the 2011 position.

Dr. Tucker also testified that he believed that each wife of a board member currently employed by the District was hired prior to her husband being elected to the Board.  He specifically explained that, in contrast, Mr. Conyears was elected to the Board after Ms. Conyears had resigned from the District, and, therefore, hiring her in 2011 would have been an initial hire (Dkt. No. 36-4, at 20-21); *see* Ark. Code Ann. § 6-24-102(16)(A) ("Initially employed" means . . . "(A) Employed in either an interim or permanent position for the first time *or following a severance in employment with the school district* . . . .") (emphasis added).  Ms. Conyears maintains that Dr. Tucker's testimony is unsupported speculation and contends that Ms. Oxner and Ms. Carroll were initially hired while their husbands were on the Board and that Ms. Oxner and Ms. Carroll were "rehired" each year their contracts were renewed.  Ms. Conyears states that the Carrolls and Oxners are Caucasian and alleges that defendants applied the ethical guidelines selectively, on the basis of race (Dkt. No. 53, at 18).  This type of allegation does not suffice to show disparate treatment and pretext.  Ms. Conyears's failure-to-hire claim for the high school principal position alleges gender discrimination, not race discrimination.  Further, there is nothing in the record to support Ms. Conyears's assertions that Ms. Oxner and Ms. Carroll were initially hired while their husbands were on the Board.  In fact, Dr. Byrd's deposition testimony, which Ms. Conyears cites in support, actually contradicts her assertion, as Dr. Byrd specifically said Ms. Carroll was able to work for the District because she was hired before Mr. Carroll was on the Board (Dkt. No. 46-1, at 18).  Moreover, defendants in their reply presented authenticated copies of Ms. Oxner's and Ms. Carroll's employee cards and the oaths taken by Mr. Oxner and Mr. Carroll, which establish that Ms. Oxner and Ms. Carroll

were most recently hired well before Mr. Oxner and Mr. Carroll took their oaths as Board members (Dkt. No. 56-1, 8; Dkt. No. 56-2, at 3-4).  Also, Ms. Conyears's reference to contract renewals ignores that the statutory definition of "initially employed" excludes renewal of teacher contracts.  *See* Ark. Code Ann. § 6-24-102(B)(i).

Lastly, Ms. Conyears attempts to show pretext by arguing that Dr. Tucker admitted in his deposition that he failed to follow proper procedure when he did not allow the committee to select applicants for interviews and by placing himself on the interview committee (Dkt. No. 53, at 19).  Ms. Conyears fails to explain how this, even if true, demonstrates pretext.

The Court finds that Ms. Conyears has failed to create a disputed genuine issue of material fact that defendants' articulated reasons for rejecting her for the high school principal position were pretext for gender discrimination.  Accordingly, the Court grants summary judgment as to defendants on Ms. Conyears's discrimination claim relating to the 2011 high school principal position.

Ms. Conyears also alleges she was discriminated against on the basis of her gender when she was denied the high school principal position in 2012.  She asserts that the applicant defendants hired, Samuel White, is an African-American male with significantly less experience than her.  Ms. Conyears in her response briefing asserts that defendants failed to move for summary judgment on the 2012 claim.  Indeed, defendants in their summary judgment papers focus primarily on the 2011 principal position, although they argue that Ms. Conyears is not qualified for the principal position whether evaluated in 2011 or 2012.  Ms. Conyears adopts her arguments as to the 2011 principal position to claim she has met her burden of production as to the 2012 position.  Defendants in their reply likewise contend that, for the same reasons as the 2011 position, summary judgment is proper as to the 2012 position.

The Court agrees that defendants did not specifically move for summary judgment on the 2012 claims.   While defendants' arguments regarding the 2011 claim and Ms. Conyears's qualifications for the high school principal position apply to the 2012 position, defendants have not contradicted Ms. Conyears's assertion that she could have held the position under an ALCP. Moreover, the record is silent as to the qualifications of the applicant selected for the position in 2012, and the Court is left with no record evidence or argument as to why defendants denied Ms. Conyears the position in 2012 and awarded the position to the other applicant.   Accordingly, to the extent defendants intended to move for summary judgment on all of Ms. Conyears's claims, their motion is denied as to the failure-to-hire claim for the high school principal position in 2012.

## V.     Retaliation Claims

Ms. Conyears in her complaint alleges that she was demoted and denied promotions prior to her resignation because of her race and in retaliation.   In her briefing, she asserts a retaliation claim based on the March 2007 elimination of the middle school principal position (Dkt. No. 53, at 15-16) and on the failure to hire her for the high school principal positions in 2011 and 2012. Ms. Conyears appears to allege each of these retaliation claims under § 1983, except for the 2012 failure-to-hire claim, which she alleges was in violation of the Fourteenth Amendment, § 1983, and Title VII.   Defendants did not specifically move for summary judgment on the 2012 failure-to-hire claim.

As to Ms. Conyears's § 1983 claims, the Eighth Circuit has recognized a right to be free from retaliation under the First Amendment but has held that no clearly established rights to be free from retaliation exist under the Equal Protection Clause of the Fourteenth Amendment. *Burton* , 737 F.3d at 1237.   Ms. Conyears does not allege a violation of her First Amendment

rights; her complaint cites only the Fourteenth Amendment.  A plaintiff may not bring a retaliation claim for complaining of discrimination under the guise of equal protection pursuant to § 1983.  *Burton*, 737 F.3d at 1236.

In her briefing, Ms. Conyears makes two, general references to bringing her claims for retaliation for "exercising her First and Fourteenth Amendment rights"  (Dkt. No. 53, at 1, 10).  Again, the First Amendment is not mentioned anywhere in her second amended complaint.  Her complaint only references Title VII, § 1983, and the Fourteenth Amendment.  Even if Ms. Conyears had alleged in her second amended complaint retaliation on the basis of the First Amendment, her claim would fail.

"To state a retaliation claim, consisting of the same elements under Title VII and the First Amendment, a plaintiff must prove that:  (1) she engaged in a protected activity; (2) that the employer took an adverse employment action against her; and (3) that the two situations are causally connected."  *Okruhlik v. Univ. of Arkansas*, 395 F.3d 872, 878 (8th Cir. 2005) (citing *Kipp v. Mo. Hwy. & Transp. Comm'n*, 280 F.3d 893, 896 (8th Cir. 2002)).  If Ms. Conyears establishes a *prima facie* case, the *McDonnell Douglas* framework applies.

Ms. Conyears first claims that Dr. Byrd's recommendation to the Board at the March 15, 2007, hearing not to renew her contract was made in retaliation for her husband's involvement in the February 2007 meeting with Dr. Byrd and for Ms. Conyears's own affirmative response to Ms. Hamilton's asking whether Ms. Conyears agreed with her husband's and the group's concerns.  Even assuming Ms. Conyears has demonstrated that she engaged in a protected activity, she cannot establish a causal connection between her support of her husband in February 2007 and Dr. Byrd's recommendation not to renew her contract.  Dr. Byrd notified Ms. Conyears of his recommendation not to renew her contract by letter in January 2007, *before* the

events Ms. Conyears cites in support of her retaliation claim.  Therefore, her retaliation claim based on events in 2007 fails because she fails to establish a *prima facie* case.

Moreover, Ms. Conyears's focus on Dr. Byrd suggests that Ms. Conyears essentially seeks to hold the District liable under a theory of *respondeat superior* for Dr. Byrd's alleged conduct; such a theory is not cognizable under § 1983.  A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents on a theory of *respondeat superior*, and "Arkansas law is clear . . . that a  school board, and not a superintendent, has ultimate responsibility for all district policies, including policies involving unfavorable employment action."  *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 652 (8th Cir. 1998).  Lastly, even if Ms. Conyears could establish a *prima facie* case, for the reasons discussed above, she cannot show that defendants' legitimate, nondiscriminatory reason for eliminating her position in 2007 is mere pretext.

Next, Ms. Conyears in her briefing asserts defendants denied her the 2011 high school principal position in retaliation for filing the instant lawsuit (Dkt. No. 53, at 20).  Defendants, in their briefing, primarily address the 2011 position as to Ms. Conyears's gender-discrimination claim, without specifically addressing the retaliation claim.  To the extent Ms. Conyears intended to raise a retaliation claim in her second amended complaint as to the 2011 high school principal position by stating generally that defendants' reason for rejecting her was "false, pretextual, discriminatory, and retaliatory" (Dkt. No. 33, ¶ 21), this Court determines defendants are entitled to summary judgment on the claim.  The Court has determined that Ms. Conyears has failed to raise a disputed genuine issue of material fact that defendants' legitimate, nondiscriminatory reason for denying her the 2011 high school principal position is a mere pretext.  Accordingly,

defendants' motion for summary judgment as to the failure-to-hire claim for the 2011 high school principal position is granted, both as to discrimination and retaliation.

As discussed above, however, defendants do not specifically request summary judgment on the 2012 retaliation claim except in their reply.   Accordingly, their request for summary judgment as to the 2012 claim is denied.

### VI.    Qualified Immunity

Defendants move for qualified immunity as to Ms. Conyears's individual capacity claims against the Board members named in her complaint.   Qualified immunity involves the following two-step inquiry:   (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.   *Mitchell v. Shearrer*, 729 F.3d 1070, 1074 (8th Cir. 2013); *see Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first).   Defendants' motion for summary judgment as to qualified immunity is granted in part and denied in part.   Based on the Court's analysis set forth above, the individual defendants are entitled to qualified immunity on Ms. Conyears's claims except for those pertaining to the 2012 high school principal position.   The Court notes that defendants make a brief argument that some of the individual defendants were not members of the Board at the time of each adverse employment event about which Ms. Conyears complains.   However, the record does not establish who was on the Board at the time of the denial of the 2012 high school principal position.   There is not sufficient evidence in the record for the Court to evaluate this as a basis for qualified immunity or summary judgment on this claim.

## VII.    Punitive Damages

Defendants also move for summary judgment on Ms. Conyears's claim for punitive damages.  The issue is moot except as to Ms. Conyears's remaining discrimination and retaliation claims for the 2012 high school principal position.  Ms. Conyears's claim based on the 2012 high school principal position, including a request for punitive damages for this claim, will proceed to trial.

*** 

For the above reasons, defendants' motion for summary judgment is granted in part and denied in part.  Defendants' motion for summary judgment is granted except as to Ms. Conyears's claims relating to the 2012 high school principal position.  Ms. Conyears's remaining claims are dismissed with prejudice.

SO ORDERED this the 21st day of March, 2014.

_____
Kristine G. Baker
United States District Judge